

*Palmetto Center of Psychiatry*

January 16, 2022

Alex T. Postic, Esquire
Postic Law Firm, LLC
1813 Marion Street
Columbia, SC 29201

Re: Kelsey Leigh Curles (DOB ▓▓▓▓▓▓)

Dear Mr. Postic,

On approximately November 24, 2021, you inquired of me to perform a forensic psychiatric evaluation of your client, Kelsey Curles, to evaluate her mental state and assess character attributes and/or mental illness that may or may not have contributed to the circumstances of her arrest. As part of this evaluation, I interviewed Kelsey via synchronous interactive communication utilizing JurisLink on December 20, 2021 for approximately one hour and 30 minutes, and again on January 7, 2022 for approximately one hour and 15 minutes. In addition, I obtained collateral information by telephone from Kelsey's maternal grandmother, Brenda Reed, on January 7, 2022 for approximately one hour. In addition, I reviewed the following material:

1. United States of America versus Kelsey Leigh Curles information, elements, and penalty sheets;
2. PDF document of file labeled "Curles_Browser_History" (12 pages);
3. Curles, Kelsey – Discovery Log (two pages);
4. FD302_Interview_of_▓▓▓▓▓▓▓▓ (two pages dated 11/08/2021)
5. FD302_Interview_of_▓▓▓▓▓▓▓▓ (two pages dated 11/08/2021);
6. FD302_Interview_of_▓▓▓▓▓▓▓▓_2 (one page dated 11/10/2021);
7. FD302_Interview_of_Kelsey_CURLES (three pages dated 11/15/2021 of interview conducted on 11/09/2021);
8. FD302_Consent_to_Search_CURLES_phones;
9. Summary of FBI Interview with Kelsey Curles (two pages dated 11/15/2021);
10. Single page of text messages exchanged from "▓▓▓▓▓▓▓▓";
11. Dark web chats by ▓▓▓▓▓▓▓▓;
12. Phone extraction of Kelsey Curles' iPhone 6s as summarized by Kinman Thomas Glenn on November 17, 2021, File #166C-CO-3518319 (two pages);
13. Emails exchanged between ▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓ from July 29, 2021 at 11:24am through July 30, 2021 at 5:01pm (RESTRICTED_ACCESS_00030 – RESTRICTED_ACCESS_00030.19; 19 pages);
14. Text messages exchanged in emails identified as No. 13 above (RESTRICTED_ACCESS_00031 – RESTRICTED_ACCESS_00031.12; 12 pages);
15. Emails exchanged between ▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓ from July 30, 2021 at 11:24am through July 31, 2021 at 6:55pm noting much is duplication of

No. 13 above (RESTRICTED_ACCESS_00032 – RESTRICTED_ACCESS_00032.18; 18 pages); and,
16. Naval Records (RESTRICTED_ACCESS_00035 – RESTRICTED_ACCESS_00035.44).

Prior to engaging in this forensic psychiatric evaluation, Kelsey was warned that the interview was not confidential. Limits of confidentiality were reviewed with her. Also, she was informed that the interview does not establish a doctor-patient relationship. Kelsey verbalized understanding of the information presented and voluntarily proceeded with the evaluation.

Kelsey is a 21-year-old Caucasian female currently detained at Barnwell County Detention Center. She received a target letter on allegations of intent to kill, injure, harass, and intimidate persons and cyberstalking. Kelsey turned herself in on November 18, 2021. She reported this is the first time she has been arrested and described her experience of detention and current situation as "surreal." She described her current legal situation as "devastating" but was able to express hope for her future where this becomes "a bump in the road" of her past.

**Personal History**
Kelsey is from Aiken County and has lived there most of her life. Kelsey was born to teenage parents who were not wedded nor intending or planning for a pregnancy. Her mother, Heather Anderson, was age 16 and her father, Joshua Curles, was age 17 when they learned Heather was pregnant. Both Kelsey and her maternal grandmother reported that Heather was not ready to be a mother when Kelsey was born. Both identified Kelsey's father as struggling with addiction issues that interfered with his ability to be a father to Kelsey. Kelsey stated she was raised mostly by her grandparents, namely her maternal grandmother, Brenda Reed ("Granny"), who serves as her psychological mother. Kelsey identified Brenda as a "big driving force in my life" who nurtured her on a consistent basis. Kelsey said she has felt safest at Brenda's home noting Brenda has maintained a stable home that Heather was not able to provide during Kelsey's childhood. Kelsey identified Brenda as the primary person she turns to for support.

Kelsey said her mother did not "not give intimate attention" that she has needed. Kelsey described struggles to understand her mother's emotional responses and interactions with her. Kelsey was forgiving of her mother's inability to meet her needs with explanation that Heather took on a lot of responsibilities in a short amount of time at a young age. Kelsey's grandmother validated Kelsey's perception that Heather was better prepared for motherhood when Kelsey's younger half-sister (age 15) was born. Both Kelsey and Brenda acknowledged a split in Heather's relationships with her two daughters: Kelsey lived in her sister's shadow while Kelsey's younger sister could "do no wrong."

Kelsey described her observations of family relations. As noted above, Kelsey acknowledged a distant relationship with her mother throughout childhood. Separate from Heather's inability to meet Kelsey's emotional needs, Kelsey reported that her mother "hit me a lot." Kelsey described not liking her mother's choices in men. Brenda stated that Heather complained to her about Kelsey "causing problems in [Heather's] marriage." Brenda said that Kelsey's stepfather never accepted Kelsey. She reported that Kelsey's stepfather "put his hands on Heather and Kelsey seen it." Kelsey stated that her stepfather was arrested for choking Heather. Brenda said she

provided Heather money for a down payment on a townhome for Heather to live with her two daughters. However, after residing there for a short amount of time, Heather started dating a man in Jackson. Heather sold the townhome and moved herself and the girls in with her boyfriend and his five children in his double wide trailer. Ultimately, Kelsey left this place to return to Brenda's home because the boyfriend drank too much alcohol and was abusive. Kelsey said she has recently started talking with and working on her relationship with her mother.

Kelsey described dysfunction in relationships of her paternal lineage noting her father and uncle did not receive emotional support from their dad. Whereas her uncle became a successful business owner and family man, her father went a different path and found his way into drugs and crime in his early teenage years. She described her paternal grandmother ("Nana") as an enabler who "never really correct[ed]" her father or held him accountable. For example, she said Nana would bail her father out of jail and pay child support he owed for Kelsey. Brenda reported that once Joshua stole Kelsey's play station and pawned it to support his addiction habits. She said that there were times he arrived at her home intoxicated with beer on the back of a moped with intention to pick up Kelsey. Brenda said that Joshua has taken money and wine from her as well. Brenda said that Kelsey is aware of these events even though "we've never dogged him out like that." She described Joshua as "a bad, bad influence." Kelsey perceived her Nana as having resentment towards Heather because Heather pursued Joshua in court to prevent him from having custody of Kelsey and for him to pay increased child support. These perceptions as initially described by Kelsey were reiterated in the interview with Brenda.

Kelsey reported she changed schools four times (all but one within the same district) in high school. She attributed transfers to changes in her residence. Kelsey stated she did "pretty good" with her academics. She said she like science and language arts. She said she was able to exempt her high school biology exam. Kelsey denied a history of repeating grades. Brenda said Kelsey is artistically very talented but has not fulfilled her artistic potential. Kelsey reported that she graduated from South Aiken High School in 2019.

Kelsey said she joined the Navy with a desire to serve her country and travel. She said she felt she had found her calling with enlistment. Naval records show she enlisted on March 11, 2020 in the Naval Reserve for an eight year service commitment. These records document she received a National Defense Service Medal on July 22, 2020. Kelsey was excited about her military future that began with boot camp (2020) in Great Lakes, Illinois. She said she performed well on the aptitude component of the Military Entrance Processing Station (MEPS) but struggled with the physical qualifications. She reported that despite several attempts to complete a physical challenge, she not only did not meet the minimum standard but sustained injury in a second attempt. According to Kelsey, "My life depended on passing this test" and her failure on the fitness test crystalized her fear of not becoming a sailor. Kelsey said she was medically discharged for bilateral stress fractures and issues with her feet. DD Form 214 documents that Kelsey was discharged from the military on November 16, 2020 for "Condition, Not A Disability." Discharge from the Navy was very difficult for Kelsey and triggered symptoms of depression. She said her mood symptoms "hit like a bullet train" noting her discharge occurred proximal to also learning of her aunt being diagnosed with cancer.

Kelsey said her mother has maintained steady employment as a manager at Belk and eventually obtained a two-year medical degree at Aiken Technical College. She said that Heather currently works in clinical research at a doctor's office. Kelsey reported that her father has no reported history of sustaining gainful employment. She said her father has not been able to keep a driver's license until recently due to his history of "so many DUIs." She reported that her maternal grandmother worked as a safety manager at Plant Vogtle until being laid off in 2017. She said that her paternal grandmother is employed as a cosmetologist.

### Substance History
Kelsey denied use of cigarettes or alcohol. She reported her only use of marijuana as using once when visiting a friend in California who made a legal purchase of marijuana from a dispensary. Kelsey denied other illicit drug use.

### Affiliations
Kelsey denied gang affiliation. This is congruent with her denial being a current or previous member of a gang on the United States Navy Aberrant Behavior Screening Certificate.

### Adverse Childhood Experiences (ACEs)
Kelsey has a history of adverse childhood experiences including being hit by her mother, witnessing domestic violence (mother victimized by mother's paramours), and made a victim to childhood sexual assault by her maternal grandmother. Kelsey reported being exposed to domestic violence while living with her mother and stepfather and with her mother and one of mother's boyfriends in Jackson. Kelsey reflected on one event in which her stepfather choked her mother while she was asleep in the home. The next day her mother disclosed the incident to Kelsey who was aware this incident was the basis for her stepfather's arrest that same day. Kelsey disclosed three sexual assaults by her maternal grandfather when she was a teenager. She said she disclosed the sexual abuse to her mother but that nothing was done until Kelsey told her maternal grandmother. Kelsey said that upon disclosing the assaults to her grandmother, Brenda got "right on it" and took Kelsey to the police station to file a report. No further action was taken on the matter.

### Past Medical/Surgical/Family Histories
Kelsey has no chronic medical problems. She reported a history of trauma to the left side of her head when injured at a bouncy house entertainment venue at age 11. Kelsey was not aware of residual impairment from this event. She denied a history of surgeries. She is on no prescription medications. She reported allergy to amoxicillin/clavulanic acid (Augmentin®).

Her paternal grandmother has a history of ovarian cancer. A maternal great aunt has a history of uterine cancer.

### Psychiatric History
Kelsey reported that her first experience with depression happened in her teenage years after her grandfather fondled her and a subsequent dysphoria following discharge from the Navy. Brenda said that discharge from the Navy affected Kelsey "in a very bad way" noting she observed Kelsey to be sad, depressed and disappointed in herself. Brenda stated that Kelsey is currently "very depressed" with her legal situation.

Kelsey said she had previously been in counseling at Aiken Counseling Group (approximately 2016). She reported a history of suicidal thinking but denied a history of suicide attempt(s). Kelsey denied a history of non-suicidal self-injurious behaviors such as cutting or burning herself. She denied having tattoos but stated she had previously contemplated getting "a little Simba" on her wrist but decided against it because she did not want to risk employment opportunities.

Naval records document that on November 5, 2020 Kelsey received administrative counseling about being diagnosed with an adjustment disorder with depressed mood.

### Mental Status Examination

Kelsey was adequately groomed wearing standard issue detention jumpsuit. She maintained appropriate eye contact without evidence of excessive scanning or intensity of gaze. She was quick to engage in interview which she did on both interviews with a sense of urgency. Kelsey appeared forthcoming with information noting she disclosed life events that put in both favorable and unfavorable light. She displayed a normal range of psychomotor activity free from tremor, tics or bizarre mannerisms. Her speech was fluent, clearly articulated and comprehensible. Her speech was of normal volume, intonation, and prosody. She described her mood state as "tired" noting she feels "numb to certain things." Kelsey denied being angry. Her displayed an isolation of affect (i.e., appeared numb and disconnected when giving trauma narratives). Kelsey's thought processes were linear although there were times where she was overly inclusive of unnecessary details. Kelsey reported that she has experienced suicidal thoughts while incarcerated, but currently has no plan or desire to harm or kill herself. Kelsey spoke with future orientation. She articulated plans to return to school and, perhaps, get married. Kelsey did not manifest or endorse symptoms of psychosis. She did not manifest thoughts held to delusional intensity nor did she display response to internal stimuli. Kelsey appears to appreciate the seriousness of her current legal situation and the gravity of her actions even though she decided to retract discussed plan before anyone was physically harmed. As such, it is opined that insight into her current legal situation is adequate. Her judgment is limited by her tendencies to trust early in new relationships as she desires to fill her void of feeling unconditional love by her parents in childhood.

Kelsey reported the current and most recent two presidents accurately. She reported that South Carolina is on the "East" Coast. She paused and contemplated whether it is the Pacific or Atlantic Ocean off the coast of SC. Ultimately, she guessed correctly. She struggled to solve a math problem involving money: Kelsey reported she would receive $3.27 as change from $5 for an item that cost $2.27. She made one error when spells a five-letter word in reverse. Kelsey was able to register three nouns immediately. After brief delay, she recalled one of the three nouns spontaneously and the other two when a cue was provided. Kelsey struggled with interpretation of a proverb. She knew not to take the phrase "don't cry over spilled milk" literally. However, she was not quite certain what it meant.

Kelsey denied neurovegetative symptoms of acute depression. Although she reported that she was "not doing well," Kelsey gave this report in context of her current situation and the conditions of detention. She reported discomfort with the cold temperatures she has experienced

in jail noting it makes it difficult for her to sleep. Kelsey did not describe or manifest signs or symptoms of mania or hypomania.

## Case Formulation

Kelsey is best understood by the system in which she was raised and her understandings of her childhood experiences. Kelsey manifests symptoms of borderline personality disorder but not of a sufficient pattern or intensity on current examination to establish criteria for this diagnosis. Although Kelsey reports prior episodes of feeling "depressed," on current interview she did not endorse a sufficient number or persistence of symptoms to meet criteria for a major depressive episode. This does not negate the validity of her depressed feelings but redirects diagnosis from MDD to a different understanding of her experienced feelings and the triggers for emotional changes. Despite a trauma history and of witnessing multiple events of domestic violence, Kelsey denied screening questions suggestive of posttraumatic stress disorder. It is my professional opinion that the most accurate diagnosis to capture her symptoms of intermittent dysphoria, disrupted interpersonal relationships, fragmented sense of self with lowered self-esteem, emotional immaturity and poor coping skills are best described as **borderline personality traits**. Separate from manifesting traits of borderline personality disorder, Kelsey does meet diagnostic criteria for **adjustment disorder with depressed mood** for her current situation of legal issues and being in detention. Kelsey does not meet criteria for Conduct Disorder or Antisocial Personality Disorder.

Kelsey was born into a family unit that was not joined and ill-prepared to meet her basic emotional needs. Neither parent was of age or maturity to have a child at the time Kelsey was born. Hence, she has been raised and influenced mostly by her grandmothers. When integrated into her mother's life, Kelsey has been exposed to domestic violence, marginalization, and rejection. Hence, Kelsey has struggled to find her place of acceptance in her family. In childhood she has held deep desires for attention and affection from her mother and father. However, neither could meet her basic or emotional needs. Fortunately, Kelsey has had support from her maternal grandmother who has consistently provided Kelsey with basic needs (i.e., safe shelter, clothing, access to medical care) and emotional support. However, despite her grandmother's availability, it has not replaced Kelsey's deep yearning for love and attention from her mom and dad. These emotional voids leave Kelsey vulnerable to trust others prematurely, respond more quickly and with more intensity to perceptions of acceptance, love and affection, and to unravel more severely when faced with rejection.

Kelsey has an identified system of adequate support by her maternal grandmother. She said she and her mother are working to improve their relationship. Kelsey has longevity of financial support and an open opportunity for some level of emotional and financial support from her paternal grandmother. However, the relationship with her father is fractured and unlikely to change in the immediate or distant future as Kelsey identified him as continuing to deal with active addiction issues.

Kelsey's psychological profile is benefitted by mental health supports. Psychotherapy is frontline intervention for her personality structure. Engagement in counseling can promote emotional healing and maturation, improved coping skills, and further diagnostic clarification. Kelsey is not on psychotropic medication. Neither Kelsey nor her grandmother indicated a

desire for Kelsey to be treated with psychiatric medication at this time. Although Kelsey may benefit from treatment with an antidepressant medication, pharmaceutical intervention is not of urgency at the present time. Engagement in counseling and psychotherapy is expected to reduce her risk of recidivism.

The opinions contained in this report are my professional medical opinions offered to a reasonable degree of medical certainty. They are based on my training, knowledge, experience and expertise in the field of psychiatry with special training and board certifications held in Child and Adolescent Psychiatry and Forensic Psychiatry.

*Amanda B. Salas, MD*

Amanda B. Salas, MD
Consulting Forensic Psychiatrist

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal No.: 1:21-cr-789-MGL |
| vs. ) | |
| ) | |
| KELSEY LEIGH CURLES, ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO SET BOND

### Overview

Kelsey Leigh Curles is charged on an Information charge of Cyberstalking. Ms. Curles self-surrendered on Thursday, November 18, 2021, and a detention hearing was scheduled for that afternoon. At that time, the Defendant waived her right to a detention hearing reserving the right to petition the Court at a later date. Ms. Curles has been detained at the Barnwell County Detention Center since her self-surrender.

### Background

Ms. Curles is a 21 Year Old young woman from Aiken, South Carolina.

### Argument

In determining whether a defendant is eligible for pretrial release, a judge must consider the factors outlined in 18 U.S.C. § 3142(g).

#### A. Nature and Circumstances of the Offense

Ms. Curles is before the Court on one charge Cyberstalking (18 U.S.C. § 2261A(2)). In this case, the alleged Cyberstalking offense did not result in death of the victim, nor in permanent disfigurement or life threatening bodily injury to the victim, nor in serious bodily injury to the victim. There are no allegations that Ms. Curles used a dangerous weapon, and there are no allegations that the offense would constitute an offense under the sexual abuse chapter (18

1

U.S.C. § 109A). The lack of any aggravating factor puts Ms. Curles's Cyberstalking in the lowest penalty level (maximum term of imprisonment for not more than 5 years). Although the original target letter of November 8, 2021, indicated that Ms. Curles was under investigation for more serious charges of Murder For Hire and Solicitation To Commit A Crime Of Violence, she is before the Court for bond on the relatively lesser charge of Cyberstalking – a charge that is appropriate for pretrial release on bond.

### B. Weight of the Evidence Against the Person

The Government presents multiple discussions on the dark web from the end of August 2021 to October 2021. These discussions begin with Ms. Curles looking for someone to commit physical harm to the victim, but twice Ms. Curles looks to find someone to murder the victim and his wife. There are five dark web chats where Ms. Curles is interested in a beating, and there are two inquiries into murder. The Government presents evidence that Ms. Curles deposited a small amount of money into bitcoin and transferred it to a dark web entity in late September. This appears through the dark web chat to refer to an initial payment to have the victim beaten. The Government presents recorded conversations with an undercover agent from November 5, 2021, where Ms. Curles and the agent discuss her hiring someone to kill the victims. The conversations are all initiated by the agent who makes the call and appears to be pushing Ms. Curles for a definitive response. In these conversations, Ms. Curles displays a lot of hesitancy and ultimately tells the agent "I have made up my mind. I am probably not going to do it. It's not me. If I have a change of heart, I will hit you up." There is no subsequent activity from Ms. Curles.

### C. The History and Characteristics of the Person

Kelsey Leigh Curles was born on ███████████ in Aiken, South Carolina. She graduated South Aiken High School in 2019. She was briefly in the United States Navy. Before her arrest, she has been employed with Door Dash, AG White Framing, and Batesville Tool & Dye. She has no criminal record. She has a close relationship with her family who all live in or near Aiken. She lives with her paternal grandmother Lisa Davis. (see Exhibit A: letters of support from friends and family).

As previously stated, Ms. Curles self-surrendered on Thursday, November 18, 2021. She has been cooperative with law enforcement agents throughout this process (e.g., giving consent

2

to have her phones searched on November 9, 2021). Ms. Curles has taken advantage of the educational and self-improvement courses offered in the Barnwell County Detention Center while incarcerated (see Exhibit B: partial list of participation in programs at Barnwell County Detention Center).

### D. Nature and Seriousness of the Danger to the Community

Ms. Curles poses no danger to the community. Dr. Amanda Salas has evaluated Ms. Curles and does not deem her to be a danger to the community nor a danger to herself (see Exhibit C: psychiatric report, Exhibit D. CV of Dr. Salas). Dr. Salas's evaluation concludes that Kelsey's mental state can be treated through therapy.

### Conclusion

For the foregoing reasons, the defendant Kelsey Curles respectfully requests that this Court set a reasonable bond in this matter. If she is released from custody, she will be better equipped to work on her emotional and psychological issues, and she will be more accessible to aid her undersigned attorney in her representation. Ms. Curles will abide by any conditions set by this Court and return at the call of Court.

Respectfully submitted,

s/Alexandre Thomas Postic
Alexandre Thomas Postic
Postic Law Firm, PA
Post Office Box 11926
Columbia, South Carolina 29211
alex@posticlawfirm.com
(803) 771-8081 Facsimile: (803) 771-4888

ATTORNEY FOR THE DEFENDANT
FEDERAL ID #: 6713

Columbia, South Carolina
February 22, 2022

3